

1    **NOT FOR PUBLICATION**

2

3

4

5

6

7

8                         UNITED STATES BANKRUPTCY COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10                        SAN FERNANDO VALLEY DIVISION

11

12   In re

13   EASYRIDERS, INC.,
     a Delaware corporation,

14
            Debtor and
15          Debtor in Possession.

16   In re
        PAISANO PUBLICATIONS, INC.,
17      a California corporation,

18
            Debtor and
19          Debtor in Possession.

20

21   THE JOINT LIQUIDATING TRUST OF
     EASYRIDERS, INC. and PAISANO
22   PUBLICATIONS, INC.,

23                 Plaintiff,

24          v.

25   BAYVIEW COMMERCIAL LEASING and
     JOHN MARTIN,

26                 Defendants.

27

28

Case No. SV 01-16836 KT (Easyriders, Inc.)
Case No. SV 01-16838 KT (Paisano
Publications, Inc.)

(Jointly Administered under Case No. SV
01-16836 KT)

Chapter 11

Adversary No. AD 05-01375 MT
Adversary No. AD 05-01376 MT
(Consolidated under AD 05-01375 MT)

[Formerly Adversary Proceeding Nos. AD
02-01623 AG and AD 03-01296, which were
consolidated under Adversary Proceeding
No. AD 02-01623 AG]

**MEMORANDUM DECISION AFTER
TRIAL – FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

- 1 -

BAYVIEW COMMERCIAL LEASING,

                   Cross-Claimant,

     v.

JOHN MARTIN,

                   Cross-Defendant.

---

THE JOINT LIQUIDATING TRUST OF
EASYRIDERS, INC., and PAISANO
PUBLICATIONS, INC.,

                   Objector,

     v.

JOHN MARTIN,

                   Respondent.

---

THE JOINT LIQUIDATING TRUST of
EASYRIDERS, INC., and PAISANO
PUBLICATIONS, INC.,

                   Plaintiff,

     v.

WILLIAM PRATHER and DANIEL J.
GALLERY,

                   Defendants.

---

     Easyriders, Inc. ("Easyriders") and Paisano Publications, Inc. ("Paisano," and jointly with Easyriders, "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Bankruptcy Code on July 17, 2001 ("Petition Date").  On July 20, 2001, the Court ordered joint administration of these cases under Case No. SV 01-16836-AG.

     On February 27, 2003, Debtors filed a first amended complaint against John Martin ("Martin") and Bayview Commercial Leasing ("Bayview") for avoidance, recovery of fraudulent and preferential transfers, and turnover of property of the estate ("Martin Action").

     Martin filed an answer to the first amended complaint on March 31, 2003.  Bayview

1  filed an answer to the first amended complaint and a counterclaim against Martin for express

2  and implied indemnity and declaratory relief on April 4, 2003. On April 25, 2003, Martin filed

3  an answer to Bayview's counterclaim.

4      Martin filed a proof of claim in the Easyriders bankruptcy case, pursuant to which he

5  asserted a contingent general unsecured claim for indemnity for amounts he purportedly paid

6  in relation to two actions in which he is or was a party: *Easyriders, Inc. v. Pierce*, Case No.

7  CV F 99-5837 (E.D. Cal.) ("Pierce Action"), and *Bay View Commericial Finance Group v.*

8  *Martin, et al.*, Case No. C-418933 (San Mateo Superior Court) ("Bayview Action"). The

9  Committee and the Debtors filed objections to Martin's proof of claim.

10      Debtors and the Official Committee of Unsecured Creditors ("Committee") filed their

11  joint Plan of Reorganization ("Plan"), dated January 15, 2003. On March 3, 2003, they filed

12  their First Amended Disclosure Statement. The Court confirmed the Plan on March 13, 2003.

13  On the effective date of the Plan, the Joint Liquidating Trust of Easyriders, Inc. and Paisano

14  Publications, Inc. ("Trust" or "Plaintiff") became the successor-in-interest to the Debtors,

15  including the claims and interests that are the subject of the Martin Action, and the

16  designated representatives of the Debtors' bankruptcy estates.

17      The Court ordered consolidation of the Martin Action and the contested matter arising

18  from the objections of the Committee and the Debtors to Martin's proof of claim on April 8,

19  2003. In the same order, the Court substituted the Trust for the Debtors as plaintiff and

20  objector in the consolidated action.

21      Plaintiff filed a complaint against William Prather and Daniel J. Gallery, on June 24,

22  2003, for avoidance and recovery of fraudulent and preferential transfers ("Prather Action").

23  Prather and Gallery's answers to the complaint in the Prather Action were filed on August 1,

24  2003. On January 16, 2004, the Martin Action and Prather Action were consolidated.

25  **I.    BACKGROUND**

26      **A.    The Loan and the Promissory Notes**

27      Newriders, Inc. ("Newriders"), formerly known as American Furniture Wholesale, Inc.

28  and incorporated under Nevada law on July 13, 1995, borrowed $1,050,000 ("Loan") from

Franchise Mortgage Acceptance Company, LLC ("FMAC") on or about October 21, 1997 by entering into three secured installment Promissory Notes dated October 21, 1997 ("Promissory Notes"). To guarantee payment of the Promissory Notes, FMAC obtained written guarantees ("Guarantees") from various individuals, including John Martin, William Prather ("Prather"), Marna Prather, Daniel J. Gallery ("Gallery"),[1] William Doyle, Michael Purcell, Leon Hatcher, Sandra Hatcher, William Nordstrom, and Sherry Nordstrom. In November 1998, Bayview became the successor-in-interest to FMAC with respect to the Promissory Notes and Guarantees. In December 1999, Bayview declared a default under the Loan, accelerated the debt, and demanded payment in full from the guarantors.

**B.    The Corporate Reorganization**

Easyriders, incorporated under Delaware law on May 13, 1998, was a wholly owned subsidiary of Newriders prior to September 23, 1998. A reorganization occurred on September 23, 1998, whereby (1) Easyriders acquired all of the outstanding common stock of Paisano and certain affiliated corporations (collectively, "Paisano Companies"), (2) Easyriders acquired all the outstanding membership interests of El Paso Bar-B-Que Company ("El Paso"),[2] and (3) a subsidiary of Easyriders merged into Newriders. As a consequence of the merger, individuals that were stockholders of Newriders immediately prior to the merger, other than dissenting stockholders, became stockholders of Easyriders, as all of the issued and outstanding shares of the common stock of Newriders was exchanged for the common stock

---

[1]    Gallery argues he was not a guarantor, although he does not deny signing the Guarantee and having it acknowledged. Instead, he denies realizing what he signed was a guarantee, and said he believed it was a Board Resolution based on certain representations that were allegedly made to him. I do not find Gallery's argument meritorious. His failure to read this document is no defense. *Randas v. YMCA of Metropolitan Los Angeles*, 17 Cal. App. 4th 158, 163 (1993) ("It is well established, in the absence of fraud, overreaching or excusable neglect, that one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it."

[2]    M&B Restaurants, L.C. dba El Paso Bar-B-Que Company, is a Texas limited liability company that was formed on September 13, 1994, which owned and operated three barbeque and smoked meat restaurants operating under the name "El Paso Bar-B-Que," as of September 23, 1998. These restaurants were located in Arizona and Oklahoma.

of Easyriders on the basis of one share of Easyriders common stock for two shares of Newriders common stock. Additionally, Newriders, the Paisano Companies and El Paso became wholly-owned subsidiaries of Easyriders. After the reorganization, however, because Easyriders transferred the El Paso membership interests to Newriders, El Paso became a wholly-owned subsidiary of Newriders. Nomura Holdings America Inc. ("Nomura") funded this reorganization through a loan of $22 million to Paisano, secured by all of its assets. Easyriders, as well as others, guaranteed repayment of the Nomura loan.

### C.   Status of the Parties

Martin was Chairman of the Board of Directors of Newriders from July 8, 1997 to December 31, 2000. Prather was a Director, President and CEO of Newriders from October 7, 1997 to October 4, 2000. Gallery was a Director of Newriders from August 1997 to September 1998. After the reorganization, Newriders filed an "Annual List of Officers, Directors And Agents" with the Secretary of State of Nevada for the fiscal years ended 1999, 2000 and 2001, and its corporate status remained active until 2003.

Martin was Chairman of the Board of Directors of Easyriders from May 13, 1998 to March 1, 2001, and Chairman of the Board of Directors of Paisano from July 1, 1999 to December 30, 2000. Prather was Director of Easyriders from May 13, 1998 to March 1, 2001, and its CEO from October 28, 1998 to October 5, 2000. Prather was also a Director of Paisano from October 28, 1998 to March 1, 2001. Gallery was a Director of Easyriders from June 30, 1998 to March 1, 2001. Martin resigned as Director and Chairman of the Board of Directors of Easyriders effective March 1, 2001. Prather and Gallery resigned as Directors of the Board of Directors of Easyriders also effective as of March 1, 2001.

Defendants testified that their involvement in their respective positions with Easyriders and Paisano ended at an earlier date and that they really were no longer involved with Easyriders months earlier. This does not relieve them of their responsibilities and does not void the dates these documents were actually effective. They had a legal duty to carry out the responsibilities of the position until the effective date of their resignation.

1

### D.    The Transfers

2    Within four years of the Petition Date, the Debtors made payments to FMAC and

3    Bayview in the aggregate amount of $761,029.33 (collectively, "Bayview Transfers") pursuant

4    to nineteen checks drawn on the Debtors' bank accounts.  Eighteen of the checks were

5    issued by Easyriders in the aggregate amount of $712,708.33 and drawn on a bank account

6    Easyriders maintained at Bank of America (account no. 06942-09128) ("Easyriders Account").

7    The nineteenth check in the amount of $48,321.00 was issued by Paisano and drawn on a

8    bank account it maintained at Los Robles Bank (account no. 2010771) ("Paisano Account").

9    Within one year before the Petition Date, the Debtors made nine payments to Bayview

10    in the total aggregate amount of $422,982.23 (collectively, "Avoidance Period Transfers"),

11    pursuant to nine checks drawn on the Debtors' bank accounts.  Eight of the checks were

12    issued by Easyriders in the aggregate amount of $374,661.23 and drawn on the Easyriders

13    Account.  The ninth check in the amount of $48,321.00 was issued by Paisano and drawn on

14    the Paisano Account.  These transfers constitute a portion of the Bayview Transfers.

15    Within 90 days before the Petition Date, Easyriders made two payments to Bayview in

16    the aggregate amount of $48,321.00 (collectively, "Preference Period Transfers"), pursuant to

17    two checks issued by Easyriders and drawn on the Easyriders Account at Bank of America.

18    These constitute a portion of the Bayview Transfers and the Avoidance Period Transfers.

19    The Bayview Transfers, Avoidance Period Transfers and Preference Period Transfers

20    reduced the amount owed on the FMAC loan and the contingent liability of Defendants

21    Martin, Prather, Gallery and others on their Guarantees by the amount of such transfers.  If

22    Defendants were creditors with general unsecured claims against Easyriders, they received

23    100% payment on such claims as a result of the Preference Period Transfers and the

24    Avoidance Period Transfers.  General unsecured creditors of the Debtors would have

25    received at most an estimated 6.2% recovery under a hypothetical chapter 7 liquidation.

26    The Bayview Transfers constitute property in the possession, custody or control of

27    Bayview during the pendency of the cases that the Debtors may use, sell or lease under 11

28    U.S.C. § 363, and that is not of inconsequential value or benefit to the Debtors' estates.

- 6 -

Bayview had actual notice or actual knowledge of the commencement of the cases concerning the Debtors and had notice or knowledge that the cases had begun and that the Bayview Transfers were property of the Debtors in the cases.

### E.    Plaintiff's Complaints

Plaintiff alleges five claims for relief in the Martin Complaint and the Prather and Gallery Complaint (jointly, "Complaints").  In Plaintiff's first claim for relief, Plaintiff requests the avoidance and recovery of nineteen of the twenty-two payments Debtors made to FMAC and Bayview ("Bayview Transfers"), from December 4, 1998 through May 30, 2001, totaling $761,029.33, as fraudulent transfers under the Bankruptcy Code sections 544(b), 550(a) and 551 and California fraudulent transfer law, namely Cal. Civ. Code § 3439.05.

In Plaintiff's second claim for relief, Plaintiff asserts that on or within one year prior to the Petition Date, Debtors made nine payments to Bayview totaling $422,982.23 ("One-Year Period Transfers").  These One-Year Period Transfers comprise a portion of the Bayview Transfers.  Plaintiff requests avoidance and recovery of the One-Year Period Transfers as fraudulent transfers under Bankruptcy Code sections 548(a)(1)(B), 550(a), and 551.

In Plaintiff's third claim for relief, Plaintiff seeks avoidance and recovery of two payments made on or within ninety days prior to the Petition Date that Debtors allegedly made through checks dated April 30, 2001 and May 30, 2001 ("Preference Period Transfers"), under Bankruptcy Code section 547(b), 550(a) and 551.

In Plaintiff's fourth claim for relief, Plaintiff alleges that on or within one year prior to the Petition Date, Debtors made payments to or for the benefit of insiders ("Insider Period Transfers") amounting to $422,982.23.  Plaintiff requests avoidance and recovery of this amount as preferential transfers under Bankruptcy Code sections 547(b), 550(a), and 551.

Plaintiff's fifth claim for relief arises solely from the Martin Complaint.  Plaintiff claims that the Bayview transfers are property of the estate, and as such, Bayview, which is in possession of the Bayview Transfers and the beneficiary thereof, must be mandated under Bankruptcy Code section 542 to turnover the Bayview Transfers or their equivalent value.

## II.    THE ELEMENTS OF FRAUDULENT TRANSFER

### A.    Jurisdiction, Venue and Standing

The Court has jurisdiction over this proceeding under the Bankruptcy Code pursuant to 28 U.S.C. §§ 151, 157, and 1334.  Venue in this Court is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding in which this Court may enter a final judgment.

Plaintiff is the successor-in-interest to the Debtors and designated representative of the Debtors' bankruptcy estates and is authorized to exercise avoiding powers for the benefit of the estates post-confirmation, including, but not limited to, the avoiding powers provided by Bankruptcy Code sections 544, 547 and 548.

### B.    The Fraudulent Transfer Causes of Action

Based on the reasoning below, I find that the Bayview Transfers are fraudulent transfers under both California Civil Code section 3439.05 and 11 U.S.C. § 548.

### 1.    Required Elements under Cal. Civ. Code § 3439.05

11 U.S.C. § 544(b) allows the trustee to avoid any transfer made or obligation incurred that would be avoidable under applicable state law by an unsecured creditor:

> [T]he trustee may avoid any transfer of an interest in property of the debtor or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable under section 502(e) of this title.

11 U.S.C. § 544(b); *Wyle v. C.H. Rider & Family, Inc. (In re United Energy Corp.)*, 944 F.2d 589, 593 (9th Cir. 1991).  As the successor-in-interest to Debtors and the designated representative of the Debtors' bankruptcy estates, Plaintiff has the power to exercise avoiding powers on behalf of the estate.

Applicable California law provides that a transfer or obligation incurred can be avoided for four years after the transfer was made or incurred if there was a creditor with a claim that existed before the transfer occurred.  Cal. Civ. Code §§ 3439.05, 3439.09(b).  California Civil Code section 3439.05 states the following:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor

whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.

For purposes of section 3439.05, a debtor is insolvent if the following circumstances are met:

(a)   A debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets.
* * *

(c)   A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent.

(d)   Assets under this section do not include  property that has been transferred, concealed, or removed with the intent to hinder, delay, or defraud creditors or that has been transferred in the manner making the transfer voidable under this chapter.

(e)   Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

Cal. Civ. Code § 3439.02.

When a transfer is avoided under Cal. Civ. Code § 3439.05, the transfer may be recovered from "[t]he first transferee of the asset or the person for whose benefit the transfer was made." Cal. Civ. Code 3439.08(b)(1).

## 2.    Required Elements under 11 U.S.C. § 548(a)(1)(B)

Under the 11 U.S.C. § 548(a)(1)(B), a trustee may avoid a transfer made or obligation incurred by the debtor within one year prior to the Petition Date if the trustee can establish that the Debtor voluntarily or involuntarily:

(i)    received less than reasonably equivalent value in exchange for such transfer or obligation; and

(ii)   (I)   was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II)   was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III)  intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B). Under the Bankruptcy Code, "insolvent" means:

    (A)    with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of –

        (i)    property transferred, concealed or removed with the intent to hinder, delay or defraud such entity's creditors; and

        (ii)    property that may be exempted from property of the estate under section 522 of this title.

11 U.S.C. § 101(32)(A).

Just as under applicable California law, when a transfer is avoided under section 548, the transfer may be recovered from either the one who received the transfer or the one for whose benefit the transfer was made.  11 U.S.C. § 550(a)(1).

## III.     DISCUSSION

### A.     The Bayview Transfers were Fraudulent Transfers

#### 1.     The Transfers Were Made by the Debtors

Debtors made, or caused their affiliates to make, the nineteen Bayview Transfers to FMAC and Bayview.  A "transfer" under California fraudulent transfer law is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with any asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance."  Cal. Civ. Code § 3439.01(i).  At trial, Bob Davis and Bob Fabregas testified that the Bayview Transfers were payments made by the Debtors in the form of checks that would draw upon their bank accounts.  Through checks dated from December 4, 1998 through May 30, 2001, Debtors transferred $761,029.33 to FMAC and Bayview.  Thus, these transfers were made by the Debtors.

Defendants argue that the funds that are the subject of the Plaintiff's fraudulent transfer claim were not property of the Debtors' estates since the Debtors did not own an equitable interest in the property, but rather, merely held the funds in trust for the benefit of Newriders.  It is undisputed that certain funds from Newriders and its subsidiaries were used by Easyriders to pay the obligations to FMAC and Bayview.  Funds that are not property of the Debtor's estate at the time of transfer cannot be the subject a fraudulent transfer claim.

Money deposited in a debtor's bank account, over which the debtor exercises control,

is property of the debtor. *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111

(5th Cir. 1995). By contrast, property held in trust for another does not become property of

the estate. *City of Farrell v. Sharon Steel Corporation*, 41 F.3d 92, 95 (3d Cir. 1994). The

burden of establishing a trust relationship lies with the claimant when property of the estate is

alleged to be held in trust. 5 Collier on Bankruptcy, ¶ 541.11 at 541-59 (15th ed. rev. 2000).

Mr. Hahn's intermediate balance and earmarking analyses were not persuasive and

did not suffice to show there were specific funds preserved for Newriders. No showing was

ever made that a trust existed or was intended in the first place, so his testimony on how he

traced Newriders funds into Easyriders was creative, but irrelevant. Howard Grobstein's

testimony was credible and much more persuasive on this point.

Here, Defendants have failed to show that either an express trust, resulting trust, or

constructive trust had been created. The evidence demonstrates that Easyriders was the

intended beneficiary of the funds received, by way of Newriders, from John Martin and El

Paso and that Easyriders could spend or allocate these funds as it wished without

restrictions. Because Defendants cannot establish the creation of a trust, the funds received

by Easyriders became property of the estate. Therefore, the Bayview Transfers were made

from property of the Debtors.

### 2.    Debtors Had Creditors Whose Claims Arose Before the Bayview Transfers Were Made

For a transfer to be fraudulent under California Civil Code section 3439.05, the debtor

must have had a creditor whose claim arose before the allegedly fraudulent transfer was

made. Here, the Newriders obligation to FMAC was incurred on September 23, 1998, the

date of the reorganization. The obligation arose in favor of Bayview in November 1998, when

it became the successor-in-interest to FMAC after November 1998. As Fabregas testified,

R.R. Donnelly, Inc. was an unsecured creditor of the Debtors existing before the Bayview

Transfers were made who had an allowed unsecured claim against the Debtors' estates as of

the Petition Date. As Davis testified, Nomura was also an unsecured creditor of the Debtors

existing before the Bayview Transfers were made who had an allowed unsecured claim

against the Debtors' estates as of the Petition Date. Davis further testified that Paisano had ongoing payment obligations to Dominick, the printer, as well as paper suppliers like WWF. McConaughy determined that the equity value of Easyriders as of December 31, 1998 was negative $12.5 million and only decreased in value after that date. As such, it would go without saying that Easyriders had creditors at, before, and after that time. Taken together, Debtors had creditors whose claims arose prior to the Bayview Transfers.

### 3. Debtors Did Not Receive Reasonably Equivalent Value in Exchange for the Bayview Transfers

#### a. Legal Principles

Although the term "reasonably equivalent value" is not specifically defined in California Civil Code section 3439, et seq., "value" is defined, in pertinent part, as "given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ." Cal. Civ. Code § 3439.03. Given the similarities and similar origins of California fraudulent transfer law and 11 U.S.C. § 548, cases applying the phrase "reasonably equivalent value" under Bankruptcy law are applicable.

Judging whether a debtor received a reasonably equivalent value involves "comparing what the debtor surrendered and what the debtor received." *Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.)*, 174 B.R. 557. 578 (Bankr. N.D. Cal. 1994); *Wyle v. C.H. Rider & Family, Inc. (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir. 1991). Transfers solely for the benefit of third parties do not constitute reasonably equivalent value. *In re Lucas Dallas, Inc.*, 185 B.R. 801, 807-08 (B.A.P. 9th Cir. 1995); *Hanson v. Cramer*, 39 Cal.2d 321, 324 (1952). Furthermore, payments by a debtor for a third-party corporation's debts have often been avoided, even when the third party is in some manner related to the debtor. *C-T of Virginia, Inc. v. PaineWebber, Inc. (In re C-T of Virginia, Inc.)*, 124 B.R. 700 (W.D. Va. 1990); *General Electric Credit Corp. of Tennessee v. Murphy (In re Rodriguez)*, 895 F.2d 725 (11th Cir. 1990).

#### b. Easyriders Did not Assume Liability on the Loan

Turning to the facts, FMAC made a loan to Newriders in October 1997. Newriders

- 12 -

executed the Promissory Notes for repayment of this loan.  Debtors never took possession or control of the loan proceeds.  Nor did Debtors ever guarantee repayment, pledge any security for repayment of the loan, or assume liability on the Loan.  Despite the reorganization in 1998, Newriders remained a separate entity, a subsidiary of Easyriders which remained responsible for its own incurred liabilities.  As admitted by Martin, Gallery, Mark Dodge, the in-house counsel for the Debtors, and Chris Anderson, the responsible officer at Bayview for the Newriders' credit, there is no document to reflect that Easyriders agreed to assume Newriders's debt liabilities or that Easyriders specifically assumed liability on the Loan.

In fact, all the writings evidence that Easyriders did not and had no intention to assume Newriders's liabilities.  In a letter from Easyriders to Deloitte & Touche LLP, dated July 10, 1998, Easyriders wrote that "no liabilities of Newriders or Newriders shareholders [would] be assumed by Easyriders, nor [would] any of the Newriders common stock be subject to any liabilities."  Exhibit 126, ¶ 7.  Again, in an opinion letter dated August 27, 1998, the same representation was conveyed by Deloitte & Touche in order to obtain favorable tax treatment for the transactions involved in the 1998 reorganization.  Exhibit 125, ¶ 7.  Finally, in the 1998 corporation income tax return for Easyriders and its subsidiaries, completed by Deloitte & Touche LLP and filed with the IRS in 1999, it clearly states that "[n]o liabilities of Newriders, Inc. were assumed by Easyriders, Inc. in the merger."  Exhibit 63.

The Note and Warrant Purchase Agreement ("Credit Agreement"), pursuant to which Nomura financed the September 1998 reorganization, evidences that Easyriders did not and could not assume the FMAC debt ("Loan").  Chris Shepard ("Shepard"), an investment banker involved in the financing of the transaction, testified that Nomura loaned only against the assets of the publishing business, and that it required covenants or provisions in the Credit Agreement to protect its credit and to try to stop the flow of cash out of the credit.  Shepard testified that one such provision in the Credit Agreement was the Restrictions on Indebtedness.  That provision states that no Credit Party, which included Easyriders, "will incur, create, assume, guarantee or any way become liable for, or permit to exist Indebtedness other than" as provided therein.  Nordstrom testified that he signed the Credit

- 13 -

Agreement and that prior to signing he had read the Restrictions on Indebtedness. Nordstrom testified that he knew that there were restrictions on the ability of Easyriders to incur indebtedness in terms of the representations made to Nomura. Nordstrom testified that the Restrictions on Indebtedness contained in the Credit Agreement do not provide an exception for the FMAC debt ("Loan").

In an e-mail written by Chris Anderson, the officer at Bayview responsible for Newriders' credit, she acknowledges that "Easyriders did not guaranty the debt [and] . . . . [a]s there is no direct relationship with Easyriders, Bayview is not a creditor in the bankruptcy . . . ." Exhibit 79. Thus, Easyriders made it clear in multiple writings that it would not be assuming liability on the Loan. While Bayview argued that Ms. Anderson's statement is not a legal opinion and not binding, her statement does indicate that Bayview had some indication of this fact. Because under the California Statute of Frauds, California Civil Code § 1624(a), a contract in which a party agrees to answer for the debts of another must be in writing, any oral agreement, if there had been one, between Easyriders and Newriders regarding assumption of liability on the Loan, would be invalid. Cal. Civ. Code § 1624(a)(2).

Defendants never addressed the basic fact that they explicitly structured the reorganization this way. They were clearly eager to get the deal done, take advantage of the perceived benefits and leave any details to the lawyers and accountants without thinking through how these details might affect their future activities. They seemed to believe such greater profits would result in the combined synergy of the new structure that they did not need to focus on the fine print that made the deal viable. Once cash flow became severely restricted, they chose to ignore earlier written obligations and corporate formalities in an effort to keep the whole operation from falling apart. The defendant guarantors also appeared to sign guarantees when needed to obtain financing from FMAC/Bayview, but found them non-binding when called upon to pay them. Their general attitude was summed up well in the testimony of John Martin. When asked why he did not just pay the Bayview debt as one of the guarantors, he just blurted out in a somewhat disdainful tone: "Why would *I* pay it?"

Fabregas's testimony bolsters this attitude of the Easyriders officers during the time

leading up to the bankruptcy filing. While Defendants attacked his credibility due to his

criminal conviction, his description of the last minute and disorganized efforts to cover the

Bayview loan with whatever funds were available rather than pay operational expenditures to

keep the business going was consistent with the testimony of Martin and Davis. The

influences on the Debtors to prefer Bayview when deciding what debts to pay and the

unusual course of those payments are precisely the type of prepetition activity the fraudulent

transfer laws are designed to stop.

### c.    There is no Successor Liability

Defendants also assert that by virtue of the September 23, 1998 corporate

reorganization, Easyriders became liable for Newriders liabilities, including liability on the

Loan, under a successor liability theory. Defendants rely on *Franklin v. USX Corp.*, 87 Cal.

App. 4th 615, 621 (2001), which states that "where one corporation sells or transfers all of its

assets to another corporation, the latter is not liable for the debts and liabilities of the former

unless (1) the purchaser expressly or impliedly agrees to such assumption, (2) the transaction

amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation

is merely a continuation of the selling corporation, or (4) the transaction is entered into

fraudulently to escape liability for debts." In addition, under *Ray v. Alad Corp.*, 19 Cal. 3d 22,

28 (1977), "a corporation acquiring the assets of another corporation is the latter's mere

continuation and therefore liable for its debts . . . only upon a showing of one or both of the

following factual elements: (1) no adequate consideration was given for the predecessor

corporation's assets and made available for meeting the claims of its unsecured creditors; (2)

one or more persons were officers, directors, or stockholders of both corporations."

These cases do not support a finding of successor liability. Critical to both tests of

successor liability is the requirement that one corporation sells or transfers all of its assets to

another corporation. This did not happen in this case. Newriders and Easyriders never

merged. Instead, Newriders merged into a subsidiary of Easyriders and retained a separate

legal existence after the 1998 reorganization. Only by having Newriders remain a separate

legal entity could Easyriders obtain tax advantages from the reorganization. Easyriders

became successor-in-interest to Newriders for financial reporting purposes, but this does not amount to a merger with Newriders. At all times, Easyriders was a separate legal entity that, after the reorganization, obtained the two wholly-owned subsidiaries of Paisano and Newriders.

The evidence Defendants use to demonstrate successor liability is primarily the stream of payments Easyriders made on the Loan, but this argument puts the cart before the horse. Moreover, the payments Easyriders made do not prove there was any merger, transfer or sale of all assets as required for a finding of successor liability. In addition, most of the testimony Defendants seek to use to purportedly show successor liability is either self-interested, not credible, and/or plainly contradictory with other documentary evidence. Significantly, each of the guarantors had a different recollection of how specifically the reorganization was structured and why. Few of those recollections were consistent with the reorganization documentation or the tax returns. As such, I do not find that the facts support a finding of successor liability in this case.

### d.    Debtors Did Not Benefit from the Bayview Transfers

While Debtors reduced Newrider's indebtedness on the Loan by making the Bayview Transfers, Debtors received nothing of value in exchange for paying the debt of Newriders, a third-party. While indirect benefits can be considered reasonably equivalent value, the defendant carries the burden of showing that debtor received a cognizable indirect benefit. *Leonard v. Mountainwest Fin. Corp. (In re Whaley)*, 229 B.R. 767, 775 (Bankr. D. Minn. 1999). While indirect value does not have to be precisely quantified, *see, e.g., In re Royal Crown Bottlers*, 23 B.R. 28 (Bankr. N.D. Ala. 1982), "[t]he indirect benefit must have been both tangible and of concrete economic value." *Leonard*, 229 B.R. at 775. To carry this burden, the defendant must show some tangible and direct benefit to the debtor resulting from the transfers and must be able to quantify it. *Meeks v. Don Howard Charitable Remainder Trust (In re Southern Health Care of Arkansas, Inc.)*, 309 B.R. 314, 319 (8th Cir. B.A.P. 2004); *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 614 (8th Cir. B.A.P. 2001).

Defendants propose three theories to support the argument that Easyriders received indirect benefits: (1) making the payments allowed Easyriders to escape having to report a default to the Securities and Exchange Commission and to investors, (2) making the payments protected Easyriders from a cross-default under the Nomura financing agreement, and (3) making the payments bestowed upon Easyriders future economic benefit either from the operation and eventual sale of El Paso or from some other vaguely defined future opportunity.

Defendants failed to submit sufficient evidence on any of the three theories that would enable the Court to conclude that Easyriders received indirect benefits of reasonably equivalent value in exchange for the property it surrendered. Here, Defendants did not offer any evidence to establish Easyriders's receipt of tangible economic benefits or a quantified dollar amount of indirect benefits. The theory of triggering a cross-default under the Nomura agreement was not supported by the evidence and remains speculative. There was no agreement among the officers of what exactly would have been reported to the SEC and what effect that might have had. These theories are also undercut by the fact that the Bayview loan was in default, and it was never reported to either Nomura or the SEC. John Martin was purposefully evasive and defensive when questioned about whether the FMAC loan default was reported to either Nomura or the SEC and whether or not the Easyriders officers considered it a reportable event. In fact, his memory failed whenever any details were sought that might explore Defendants' theories of why there was successor liability or reasonably equivalent value given to Easyriders. Lastly, how these payments made the sale of El Paso possible was never clearly shown.

Defendants further contend that Easyriders benefited from assuming Newriders's debt by assuming Newriders's publicly traded company status. Defendants argue that Easyriders received a benefit in acquiring Newriders's public company status through the corporate reorganization. By becoming a public company, Easyriders gained access to public capital and could be traded on the American Stock Exchange. This argument fails for a number of reasons. First, there was no evidence introduced that being a public company was of any

greater benefit to Easyriders than not being one.  Second, there was no assumption of liability on the Loan, and I find no support for the argument that Newriders sold its public company status for Easyriders's assumption of its debts.  The question is not what benefit Easyriders got from the reorganization, but whether it derived any benefit from the making of the Bayview Transfers.  No matter how Easyriders may have benefited from the reorganization, it did not benefit from the Bayview Transfers.

Defendants' theory under *In re McDonald*, 265 B.R. 632 (Bankr. M.D. Fla. 2001), that Newriders conferred an economic benefit on Easyriders by securing a future opportunity for economic benefit is simply too attenuated.  The evidence supporting this theory was essentially wishful thinking.

Having failed to submit sufficient, specific evidence to bolster their claim that Easyriders received indirect benefits, Defendants have failed to show that Easyriders received reasonably equivalent value.  Consequently, the Court finds that Debtors did not receive a reasonably equivalent value in exchange for the Bayview Transfers.[3]

### 4.    Debtors Were Insolvent at Time of Transfer

A debtor is insolvent under California fraudulent transfer law, if "the sum of the debtor's debts is greater than all of the debtor's assets."  Cal. Civ. Code § 3439.02(a).  There is a presumption of insolvency if a debtor is unable to pay his debts as they become due.  Cal. Civ. Code § 3439.02(c).  Similarly, under the Bankruptcy Code, a debtor is considered insolvent in the following situations:  (1) the debtor was insolvent on the date the transfer was made or became insolvent as a result of the transfer, (2) the debtor had unreasonably low capital, or (3) the debtor intended to incur, or believed that it would incur debts beyond its ability to pay as those debts matured.  11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III).

Both lay opinion testimony and expert witness testimony support the finding that Easyriders was insolvent at the time it made the Bayview Transfers.  Robert Davis was a

_____

[3]    At best, Defendants have presented tenuous, speculative, and merely potential sources of indirect benefit.  Even if I were to determine that Debtors did receive an indirect benefit, I do not find that this benefit constitutes reasonably equivalent value.

thoughtful, precise and credible witness who carefully described an insolvent company. Davis testified that subsequent to the 1998 reorganization, Easyriders had cash flow problems and payments to vendors had to be stretched beyond the normal payment terms. Often, Davis and Fabregas had to meet daily to decide what creditor should be paid and "how they could keep the doors open." Prather testified that Easyriders had capital problems after the reorganization and that insolvency caused Debtors to file bankruptcy. Defendants offered no evidence to contradict this lay opinion testimony.

Testimony from Debtors' expert witness, Dan McConaughy ("McConaughy") corroborates the lay opinion testimony that Easyriders was insolvent at the time of the transfers or became insolvent because of the transfers. McConaughy performed a detailed analysis in which he concluded (a) that soon after the 1998 reorganization Easyriders was experiencing difficulty paying its debts as they became due, and (b) that Easyriders was insolvent, as it debts exceeded its assets on a fair value basis at least from December 31, 1998 through the Petition Date. McConaughy Decl., ¶¶ 22-26, 27-34. As further evidence, McConaughy determined that as of December 31, 1998, the equity value of the Debtors, on a fair value basis, was negative $12.5 million. As of December 31, 1999, the equity value of the Debtors, on a fair value basis, was negative $22.2 million. As of December 31, 2000, the equity value of the Debtors, on a fair value basis, was negative $22.6 million. The Debtors' payable turnover was about four times longer than the industry average during the 1998-2000 period preceding the bankruptcy filings, and there was a steady rise in current liabilities since the beginning of 1999.

Mr. McConaughy was extremely credible and persuasive. His analysis of insolvency was fair and considered all the relevant factors. David Hahn, an expert witness for Defendants, failed to controvert the evidence presented by McConaughy. Hahn even admitted on cross-examination, that he could not say that Easyriders had been solvent after December 1998.

### 5.    Transfers Were Made Within Four Years of the Petition Date

Under the circumstances of this case, California fraudulent transfer law allows for recovery of transfers made within the four years of the filing of the complaint.  Cal. Civ. Code 3439.09(b).  However, under 11 U.S.C. § 544(b), the trustee succeeds to the rights of a creditor holding an allowable unsecured claim as of the Petition Date and, under 11 U.S.C. § 108(a)(2), has an extended time period to bring a state law actions.  As such, in this case the appropriate four year avoidance period for an action brought under California Civil Code section 3439.05 is the four years prior to the Petition Date.  Here, Debtors filed for bankruptcy on July 17, 2001.  Therefore, Plaintiff could avoid transfers made as early as July 17, 1997.  The Bayview Transfers were made between December 4, 1998 to May 30, 2001.  As such, all of the Bayview Transfers would be avoidable under this section.

Relatedly, the Bankruptcy Code allows for recovery of transfers made within one year of the Petition Date.  11 U.S.C. § 548(a)(1).  As such, all of the One-Year Period Transfers fall within the Bankruptcy Code period as they occurred in the year prior to the Petition Date, and would be avoidable under section 548.  However, these transfers would be inclusive of those that are already be avoidable under California Civil Code section 3439.05.  As such, even though they would be avoidable under section 548, I need not rely on that section.[4]

## IV.    THE OBJECTION TO MARTIN'S PROOF OF CLAIM

### A.    Indemnification or Reimbursement for Money Paid to Bayview

Bayview brought suit against Martin and the other guarantors of the Loan following filing of Debtors' respective bankruptcies.  Martin now seeks indemnification or

---

[4]    Because I find that Defendants are liable for the Bayview Transfers under California Civil Code section 3439.05, and this recovery is dispositive, I also do not need to reach Plaintiff's preference cause of actions or the turnover cause of action.

reimbursement for the amounts he paid to Bayview in order to settle the litigation against him.

Martin is not entitled to indemnification or reimbursement. Because Easyriders never assumed the obligation to pay the Loan, Easyriders never became liable on the Loan. Newriders was and remains the liable on the Loan. Martin concedes that he never executed an indemnity agreement with Easyriders. Nor did Martin produce any evidence to show that Easyriders assumed any indemnity agreement that Martin might have executed with Newriders. Without an indemnity agreement with the Debtors, Martin has no right to indemnification or reimbursement for money he paid to Bayview in connection with the litigation against him as a guarantor of the Loan.

### B.    Indemnification or Reimbursement for Costs in the Pierce Action

The Pierce Action involved a suit brought by Easyriders against Rick Pierce for various reasons, including a declaratory judgment that Pierce was not entitled to Easyriders stock from the reorganization. Pierce subsequently sued Martin, in an amended counterclaim and third party complaint, for alleged wrongful acts done as an individual and in his capacity as a director of Newriders.

Martin has no right to indemnity for the wrongful acts alleged against him in the Pierce Action. Again, Martin never executed an indemnity agreement with Easyriders and Easyriders never assumed any indemnity agreement that may have existed between Martin and Newriders. Martin further fails to produce any evidence that the amounts for which he requests indemnification were actually and reasonably incurred. Given these shortcomings, Martin's request for indemnification for costs incurred in the Pierce litigation is denied.

Martin's proof of claim shall be disallowed in its entirety.

### V.    CONCLUSION

Plaintiff is entitled to judgment against Defendants in the amount of $761,029.33, plus

interest at the maximum legal rate from the date of each of the individual Bayview Transfers was made until the judgment is entered, and costs according to proof. The entire amount of the judgment will bear interest at the rate set forth in 28 U.S.C. § 1961.

Martin's proof of claim shall be disallowed in its entirety.

Dated:  May 18, 2006

_____
MAUREEN A. TIGHE
UNITED STATES BANKRUPTCY JUDGE

1

## CERTIFICATE OF SERVICE BY MAIL

2

3    I certify that a true copy of this **MEMORANDUM DECISION AFTER TRIAL – FINDINGS
OF FACT AND CONCLUSIONS OF LAW** was mailed on __MAY 1 8 2006__

4    to the parties listed below:

5

6

[SEE ATTACHED SERVICE LIST]

7

8

9

10    Dated:        MAY 1 8 2006

11                                        _____
                                                  DEPUTY CLERK
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 23 -

## Service List

Counsel for Martin, Prather and Gallery
Don Fisher, Esq.
Heather C. Whitmore, Esq.
Palmieri, Tyler, Weiner, Wilhelm & Waldron LLP
2603 Main Street, East Tower – Suite 1300
Irvine, California 92614

Counsel For The Joint Liquidating Trust of
Easyriders, Inc. & Paisano Publications, Inc.
Louis E. Kempinsky, Esq.
James P. Menton, Jr,, Esq,
10100 Santa Monica Boulevard, Suite 1450
Los Angeles, CA 90067

Counsel for Bayview Commercial Leasing
David M. Wiseblood, Esq.
Preston Gates & Ellis, LLP
55 2nd Street, Suite 1700
San Francisco, California 94105

United States Trustee
MaryAnne Wilsbacher, Trustee
Office of the United States Trustee
21051 Warner Center Lane
Woodland Hills, CA 91367